# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 11, 2009 Session

## STATE OF TENNESSEE v. ABDIRIZAK OMAR YUSSUF
## In re: RADAR BONDING COMPANY, INC.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2589        J. Randall Wyatt, Jr., Judge**

---

**No. M2008-01161-CCA-R3-CD - Filed November 5, 2009**

---

Appellant, Rader Bonding Company, Inc., appeals the judgment of the Davidson County Criminal Court ordering complete forfeiture of the bail bond in the case of Defendant, Addirizak Omar Yussuf.  Appellant argues that the State's refusal to seek extradition of Defendant, who had fled to Sweden, constituted an extreme case under State v. Frankgos, 114 Tenn. 76, 85 S.W. 79, 80-81 (Tenn. 1905) which relieved Appellant of its responsibility under the bond agreement.  Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Joel H. Moseley, Sr., Nashville, Tennessee, for the appellant, Abdirizak Omar Yussuf.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Amy Eisenbeck, Assistant District Attorney General; and Lisa Naylor, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual Background

Defendant was indicted on September 20, 2005, on one count of attempted second degree murder and one count of aggravated assault.  Appellant was surety on the bail bond issued for Defendant in the Davidson County Criminal Court in the amount of $50,000.  Defendant failed to appear before the court for a jury trial on May 22, 2006.  A conditional forfeiture was taken against Defendant on that date, and a capias was issued for his arrest.  The trial court also issued a writ of scire facias notifying Appellant that the amount of the bond would be forfeited unless within 180 days Defendant was produced or Appellant showed cause why the bond should not be forfeited.  On

March 9, 2007, the trial court issued a final forfeiture in the amount of $50,000. Following a hearing on June 8, 2007, the trial court reissued the writ of scire facias, entered a conditional judgment against Appellant, and extended Appellant an additional 180 days within which to produce Defendant.

A hearing on the final forfeiture of Defendant's bond was heard on February 21, 2008. Jerry Jordan, the secretary for Appellant, testified that he maintained the company's files for each person for whom the company had issued a bond. Defendant's file contained a report from Jonathan Shorthouse, the investigator hired by Appellant to locate Defendant after he failed to appear in court. Mr. Jordan stated that according to Mr. Shorthouse's investigation, it was believed that Defendant, a Somalia national, was currently residing somewhere in Sweden with his girlfriend, Shukri Ahmed. Ms. Ahmed was also a Somalian who had been given asylum by the Swedish government under the United Nations Relocation Effort. The information was provided primarily by Defendant's family members and members of the Somalian community in Davidson County. Mr. Jordan stated that Appellant had not yet incurred the costs necessary to ascertain Defendant's exact location within Sweden because the State had indicated that it did not wish to seek extradition. Mr. Jordan said, however, that Appellant stood ready to assume the expenses associated with returning Defendant to the United States should the State choose to pursue extradition.

The State called Assistant District Attorney General Lisa Naylor as a witness. General Naylor stated that she had participated in the extradition from Mexico of three Mexican nationals charged with Class A felonies in Tennessee under the extradition treaty between Mexico and the United States. General Naylor stated that the extradition process involved significant time, expense, and State resources. General Naylor explained that in order to obtain an unlawful flight from prosecution warrant through the United States Attorney's Office, the State was essentially required to submit its entire case-in-chief supporting the charges. General Naylor stated that because of the "rigorous process" of obtaining extradition, the State pursued extradition only in those cases involving the most serious criminal charges.

The trial court found that Appellant had assumed the risk that Defendant might flee the State's jurisdiction at the time it agreed to secure Defendant's appearance in court. The trial court acknowledged Appellant's reluctance to incur the expense necessary to locate Defendant's current address in Sweden in view of the State's refusal to seek extradition, but found that "but for Mr. Shorthouse's report based on secondhand knowledge, the whereabouts of the Defendant would remain unknown." Accordingly the trial court found "that the Defendant's whereabouts are unconfirmed and without specificity."

The trial court found that:

despite the arguments and proof offered by [Appellant], that the circumstances present in the Defendant's matter do not arise to an "extreme case" as contemplated by the Court of Criminal Appeals. The Court finds that the Defendant's flight to another county was a foreseeable contingency when his bond was secured.

Accordingly, the trial court found that Appellant's bond in the amount of $50,000 was subject to final forfeiture.

## II. Analysis

On appeal, Appellant argues that the trial court abused its discretion in entering a final forfeiture judgment against Appellant because the State's refusal to seek Defendant's extradition from Sweden, notwithstanding Appellant's responsibility for the costs incurred in the process, rendered Appellant's contractual obligation to produce Defendant impossible. Relying on In re Sandford & Sons Bail Bonds, Inc., 96 S.W.3d 199 (Tenn. Crim. App. 2002), Appellant contends that the State's refusal to seek extradition constitutes a breach of the State's implied covenant not to interfere, through action or inaction, with the covenant between Appellant, as surety, and Defendant, as principal.

The forfeiture of bail bonds is governed by Tennessee Code Annotated sections 40-11-201 through 40-11-215. Specifically, Tennessee Code Annotated section 40-11-201(a) authorizes a trial court to enter a conditional judgment of forfeiture against a defendant and his sureties when a defendant fails to appear in court in accordance with a bail bond agreement. Upon the entry of a conditional judgment, the trial court must additionally issue a writ of scire facias requiring the defendant and his sureties to show cause why the judgment should not become final. T.C.A. § 40-11-202. To this end, the trial court must afford the defendant and his sureties a hearing prior to final forfeiture. Indemnity Ins. Co. of North America v. Blackwell, 653 S.W.2d 262, 264 (Tenn. App. 1983). At this hearing, a surety or bonding company may petition the court for relief from forfeiture. However, the surety bears the burden of proving that its petition should be granted. In re Paul's Bonding Company, Inc., 62 S.W.3d 187, 193 (Tenn. Crim. App. 2001).

A surety may be exonerated from forfeiture by its surrender of the defendant to the court at any time before payment of the judgment of forfeiture. T.C.A. § 40-11-203. Otherwise, the surety must seek relief pursuant to Tennessee Code Annotated section 40-11-204. That statutory provision provides that:

> the judges of the general sessions, circuit, criminal and supreme courts may receive, hear and determine the petition of any person who claims relief is merited on any recognizances [or bail bonds] forfeited, and so lessen or absolutely remit the same, less a clerk's commission . . ., and do all and everything therein as they shall deem just and right, and consistent with the welfare of the state, as well as the person praying such relief.

A trial court's discretion under Tennessee Code Annotated Section 40-11-204 is "broad and comprehensive, empowering trial courts to make determinations 'in accordance with [their] conception of justice and right.'" State v. Shredeh, 909 S.W.2d 833, 835 (Tenn. Crim. App. 1995) (quoting Black v. State, 154 Tenn. 88, 290 S.W. 20, 21 (1927)). "Accordingly, in reviewing the trial court's determinations in the instant cases, we apply an abuse-of-discretion standard." In re Paul's

Bonding Co., 62 S.W.3d at 194 (citing State v. William Bret Robinson, No. E1999-00950-CCA-R3-CD, 2000 WL 1211316, at *3 (Tenn. Crim. App., at Knoxville, Aug. 28, 2000)). Under an abuse-of-discretion standard, this Court grants the trial court the benefit of its decision unless the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997); see also State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999).

In In re Paul's Bonding Co., we further stated:

Of course, in order to determine whether the trial court in these cases applied an incorrect legal standard, we must define the correct legal standard. In this regard, our supreme court and this Court have narrowly circumscribed the circumstances in which a trial court possesses the authority to grant relief pursuant to Tennessee Code Annotated section 40-11-204. We acknowledge the apparent contradiction in limiting a trial court's "broad and comprehensive" discretion to make determinations in accordance with its conception of justice and right to a small number of circumstances. Nevertheless, citing our supreme court's decision in State v. Frankgos, 114 Tenn. 76, 85 S.W. 79, 80-81 (Tenn. 1905), we have stated that

[t]he authority to relieve sureties from liability may only be exercised in extreme cases, such as the death of the defendant or some other condition making it impossible for sureties to surrender the defendant; the good faith effort made by the sureties or the amounts of their expense are not excuses.

Shredeh, 909 S.W.2d at 836; see also State v. Le Quire, 672 S.W.2d 221, 222-223 (Tenn. Crim. App.1 984). Our supreme court in Frankgos, 85 S.W. at 81, explained that "[t]o relieve sureties upon [lesser] grounds ... would encourage defendants to forfeit their bail, and bring about a very lax administration of the criminal laws of the state."

In re Paul's Bonding Co., 62 S.W.3d at 194.

A bail bond is "a contract between the government on one side and the criminal defendant and his surety on the other, whereby the surety assumes custody of the defendant and guarantees to the State either the appearance of the defendant in court or the payment of the full amount of bail set by the court." In re Sanford & Sons Bail Bonds, Inc., 96 S.W.3d at 202. Typically, prior to or simultaneously with the execution of a bail bond,

[a professional] bondsman and the defendant form a contract in which the bail bondsman agrees, for a fee, to act as the defendant's surety. In addition to paying the fee, the defendant agrees to appear in court for all scheduled appearances. The bondsman only makes a profit when he is able to collect fees from the defendant and

avoid paying the amount of the bond to the court.... His business depends on the appearance in court of his clients.

There is, of course, risk that the defendant will sign the contract with the bondsman, secure release and leave the jurisdiction or refuse to appear in court. To protect his investment, the bondsman must be thorough not only in assessing the risk of flight before writing the bond, but in keeping tabs on the defendant after the bond is written. The profit motive is presumed to insure diligent attention to his custodial obligation.

Id. (citing Holly J. Joiner, Note, Private Police: Defending the Power of Professional Bail Bondsman, 32 Ind. L. Rev. 1413, 1422 (1999)).

The State's role in a bail bond contract was reviewed extensively by this Court in In re Sanford &Sons Bail Bonds, Inc. We first observed that the restrictive interpretation of Tennessee Code Annotated section 40-11-204 "is grounded in part in public policy considerations, Frankgos, 85 S.W. at 81, but also seemingly stems from the rule articulated by the United States Supreme Court in Taylor v. Taintor, 16 Wall. 366, 83 U.S. 366, 369, 371 (1873), that a surety will be relieved of its obligation under a bail bond only when performance is rendered impossible by a supervening act of God, act of the State that is the beneficiary of the bail bond, or act of law that is operative in the beneficiary State and obligatory in its effect upon her authorities." Id. at 203. The Taylor rule reflects the common law of contracts which requires:

that if a party charge himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties will not excuse performance. Where the parties have made no provision for a dispensation, the terms of the contract must prevail.

Columbus Ry. Power & Light Co. v. Columbus, 249 U.S. 399, 412, 39 S. Ct. 349 (1919).

As a party to the bail bond contract, "t]here is also an implied covenant on the part of the government, when the recognizance or bail is accepted, that it will not in any way interfere with th[e] covenant between [the principal and his sureties], or impair its obligation, or take any proceedings with the principal which will increase the risks of the sureties or affect their remedy against him." Reese v. United States, 9 Wall. 13, 76 U.S. 13, 21-22 (1869). That is, "a surety does not assume the risk that the State will interfere with the surety's performance of its obligation under the bail bond." In re Sandford & Sons Bail Bonds, Inc., 96 S.W.3d at 204 (citing Reese, 76 U.S. at 21-22). "A State's material breach of this implied covenant will relieve a surety of its obligation under a bail bond." In re Sandford & Sons Bail Bonds, Inc., 96 S.W.3d at 204 (citing Reese, 76 U.S. at 22, United States v. Galvez-Uriarte, 709 F.2d 1323, 1324-25 (9th Cir. 1983)).

Appellant argues that the State materially breached its covenant not to interfere with Appellant's contractual obligations by refusing to extradite Defendant from Sweden. The cases relied upon by Appellant in its brief in support of its argument illustrate the various ways a State's actions may relieve a surety of its responsibilities under the bond agreement. See Galvez-Uriarte, 709 F.2d at 1324-25 (finding that the State breached its implied covenant not to interfere with the contractual arrangement between the surety and the defendant when the Assistant United States Attorney agreed with defense counsel that the defendant could return to Mexico pending trial in violation of the terms of the bond agreement); State v. Liakas, 86 N.W.2d 373, 377-380 (Neb. 1957) (holding that the surety's obligation under a bail bond agreement was discharged when the State voluntarily waived jurisdiction over the defendant and extradited him to another state to stand trial for offenses committed in that jurisdiction); Octavio Castanada d/b/a O. Castaneda's Bail Bonds Company v. State, 138 S.W.3d 304 (Texas Crim. App. 2003) (addressing the issue of the statutory procedure a bonding company must pursue under Texas Code of Criminal Procedure Article 17.16 to raise a defense of liability on its bond when the principal is released to the custody of another jurisdiction, in that case, the INS).

As reflected in these cases and as emphasized by this Court in In re Sandford & Sons Bail Bonds, Inc., however, it must be the action of the State which causes "the surety's inability to satisfy its obligation under the bail bond." Id. at 204 (citations omitted). In In re Paul's Bonding Company, Inc., three Mexican nationals were indicted on drug and extortion charges in Tennessee. Id., 62 S.W.3d at 189. After the Appellant agreed to secure the appearance of each defendant, the defendants fled to Mexico. Id. Appellant sought relief from the conditional judgments of forfeiture arguing, among other issues, that it had entered into the bail bond contract with the understanding that an extradition treaty existed between Mexico and the United States. Id. at 191. After the defendants failed to appear for a scheduled court date, however, Appellant learned from the Office of the District Attorney General "that, as a practical matter, the extradition treaty between the United States and Mexico is unenforceable," and the District Attorney General declined to institute extradition proceedings against the defendants. Id. Appellant argued that "the existence of an extradition treaty between the United States and Mexico warrants relief as the treaty lulled the bonding company into a "false sense of security." Id. at 194.

This Court concluded that "the lack of an enforceable extradition treaty between the United States and Mexico does not warrant relief." Id. at 195 (emphasis in original). We continued:

> [i]f the appellant did not know the difficulties inherent in recapturing fugitives who have fled to Mexico, it was the appellant's business to obtain the relevant information prior to entering into bail bond agreements with Mexican citizens. Nothing in the record before this court suggests that the relevant information was unavailable to the appellant at the time of the execution of the bail bonds at issue. Indeed, [counsel for the bonding company] conceded at the September 8, 1999 hearing that the appellant could have obtained the information through adequate investigation.

-6-

Id. (see also Shredeh, 909 S.W.2d 836 (concluding that the lack of an extradition treaty between Jordan and the United States under the facts of that case did not warrant relief under Tennessee Code Annotated section 40-11-204).

We observed in In re Sandord & Sons Bail Bonds, Inc. that our previous holding in In re Paul's Bonding Company, Inc. reflects the principle that "a ground for relief asserted by the surety will not constitute an 'extreme case' for purposes of Tenn[essee] Code Ann[otated] [section] 40-11-204 if it is a realization of a risk assumed by the surety in entering into the bail bond agreement." In re Sandford & Sons Bail Bonds, Inc., 96 S.W.3d at 203.

In In re Sandford & Sons Bail Bonds, Inc., the defendant, a Mexican national, was surrendered to the Immigration and Naturalization Service by the Hamblen County Sheriff's Department after the Appellant had entered into a bail bond contract with the defendant. Id. at 201. The trial court denied Appellant relief from the entry of a final judgment of forfeiture without a hearing, finding only that the defendant's deportation to Mexico did not constitute a ground for relief. We concluded, however, that the trial court erred in not conducting a hearing to determine if under the facts and circumstances presented in the case, the surety's failure to produce the defendant was caused by the State's conduct or whether the defendant's deportation was a foreseeable risk assumed by the surety upon execution of a bail bond contract.

As noted by this Court, "in entering into bail bond agreements involving aliens, sureties are necessarily cognizant of and assume the risk that, subsequently, the defendant will engage in conduct subjecting him to deportation proceedings." Id. at 205. On the other hand, "[t]he surety does not assume the risk that the State will encourage the deportation of a defendant or otherwise refuse to cooperate in a defendant's or surety's efforts to stay deportation proceedings pending trial." Id. "Thus, to the extent the State's action or inaction effects a defendant's deportation and renders the surety's performance of its obligation under the bail bond impossible, a court may grant relief pursuant to" Tennessee Code Annotated section 40-11-204. Id.

In the case sub judice, the breach of the bond agreement at issue occurred when Defendant voluntarily fled the United States, through no action or inaction on the part of the State. The risk of a defendant's flight is inherent in every bail bond agreement. In re Sandford & Sons Bail Company, Inc. 96 S.W.3d at 202. Thus, the bondsman must evaluate the risk of flight before writing the bond and be diligent "in keeping tabs on the defendant after the bond is written." Id., (quoting Holly J. Joiner, supra, at 1422). "The exercise of due diligence by bail bond agents in processing bail bonds is expected as a matter of due course." In re Paul's Bonding Company, Inc., 62 S.W.3d at 194.

Mr. Jordan was not the agent who wrote Defendant's bond agreement and, therefore, had no personal knowledge as to what questions were asked when Defendant's bail bond contract was executed. Nonetheless, we note that Appellant's investigation of Defendant (which occurred approximately nineteen months after Defendant failed to make a scheduled court appearance) revealed that Defendant, a Somalian national, initially traveled to the United States with his adoptive mother's "family unit" to escape the Somalian wars, that Defendant and the victim of the charged

offenses belonged to different warring Somalian clans, that Defendant had impregnated Ms. Ahmed at some point while she was in the United States, that Defendant was ostracized by his family unit for impregnating Ms. Ahmed out of wedlock and "for not adhering to social customs," and that Defendant fled to Sweden after his adoptive family's ostracization. Appellant faxed a report of its investigation to the United States Marshall's Office but took no further steps to confirm the information gained through the interviews or to determine Defendant's exact location.

Appellant, as surety, "knowingly and absolutely" contracted that Defendant would be made available in court when scheduled. See Frankgos, 85 S.W. at 81. The State's policy decision not to pursue extradition after Defendant fled was not the conduct that caused the breach of contract. See State v. Seybert, 745 P.2d 687, 689 (Mont. 1987) (concluding that the State "does not have a duty to remedy the surety's breach of contract" by seeking extradition of the defendant after the defendant voluntarily fled the state's jurisdiction); State v. Ohayon, 467 N.E.2d 908, 911-12 (Ohio App. 1983) (concluding that a surety will not be relieved of its obligations when it is unable to produce the defendant due to foreign policy decisions as between the United States and Israel when the defendant voluntarily fled the country prior to his initial court appearance).

Under Defendant's theory that a surety is absolved of responsibility if the State decides not to pursue extradition of a missing defendant, a bonding company's obligations would be greatly reduced. That is, if a bond is issued to a foreign national who then voluntarily flees the country, the surety would be relieved of all obligation if the State decides that pursuing extradition is not in the best interest of the State. In other words, the State would serve as the "surety's surety," a relationship that is contradictory to the policy considerations examined in Frankgos. In Frangos, our supreme court stated that:

> [the statutory provision granting relief from a surety's bail bond obligations] certainly was not intended to authorize courts to relieve sureties upon bonds and recognizances of parties charged with crime, who had made default and were still at large, merely because the sureties had, in good faith, and at much expense, made unavailing efforts to recapture them. These obligations are not mere idle forms, but are required and made for the purposes expressed in them. Good faith is not involved. The sureties knowingly and absolutely contract that their principal shall be present at the time in the obligation stated, to answer the state upon the charge preferred against him; and, if they fail to do so, they must comply with the terms of the bond or recognizance. A wise and sound public policy requires a rigid enforcement of these bonds when breached.

Frankgos, 81 S.W. at 81.

Based on our review, we conclude that the trial court did not err in entering a final judgment of forfeiture when Defendant voluntarily fled the country and the surety was unable to produce him in court as called for in the bail bond contract. Appellant is not entitled to relief on this issue.

As a corollary argument, Appellant directs our attention to Tennessee Code Annotated section 40-11-201 which addresses the situation in which a surety is unable to produce a defendant because she or he is imprisoned in another state. This section provides that the appearance or bail bond remains in effect until a detainer is filed against the detaining authority, and the surety remains responsible for the expenses of returning the defendant to the State once he is released by the other jurisdiction. T.C.A. § 40-11-201(c). Effective June 20, 2008, the legislature amended this statutory section to provide that if the detainer request is refused or the detaining authority releases the defendant notwithstanding the filing of the detainer, "the surety may not be liable in the undertaking." 2008 Tenn. Pub. Acts ch. 1131 (emphasis added).

Defendant submits that the 2008 amendment "shows a clear public purpose that the surety and the State should both work together" in returning a defendant to Tennessee, and compares the obtaining of an unlawful flight from prosecution warrant with the issuance of a detainer. However, extradition is an entirely different procedure than detainer. The Interstate Compact on Detainers, codified at Tennessee Code Annotated sections 41-23-101 to-209, has as its primary purpose to provide cooperative procedures among the states for the expeditious and orderly disposition of charges against a prisoner. Dillon v. State, 844 S.W.2d 139 (Tenn. 1992). Extradition, however, is the process by which a person who is not in custody may be lawfully arrested and returned to another state or jurisdiction for offenses committed in that state. Extraditions between states are covered by the Uniform Criminal Extradition Act, Tennessee Code Annotated sections 40-9-101 to -130. Extraditions between countries are handled through treaties. It is presumed that the legislature was aware of the existing state of the law concerning extraditions and detainers when it enacted Chapter 1131 of the Tennessee Public Acts, and chose not to address scenarios involving extraditions. State v. Adams, 45 S.W.3d 46, 59 (Tenn. Crim. App. 2000) (citing Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). Appellant's argument in this regard affords no relief.

## CONCLUSION

After a thorough review, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-9-